**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Don Michael HUDSON, Defendant– Appellant.**

**No. 95–50359.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1996.

Submission Withdrawn May 13, 1996.

Resubmitted June 21, 1996.

Filed Nov. 20, 1996.

Dwight B. Moore, Santa Ana, CA, for defendant-appellant.

Stephen G. Wolfe, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: REINHARDT, KOZINSKI and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Defendant-appellant Don Michael Hudson entered a conditional guilty plea to charges of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Hudson appeals the district court's denial of his motion to suppress evidence seized from his bedroom during his arrest and a contemporaneous search of the premises. Hudson advances three challenges on appeal. He argues that the warrantless search which produced the drugs and firearms underlying his conviction was undertaken pursuant to a pretextual arrest. He also contends that agents of the Bureau of Alcohol, Tobacco, and Firearms ["ATF"] violated the "knock and announce" requirement set forth in 18 U.S.C. § 3109, and that the ATF agents exceeded the scope of the search incident to arrest and the plain view search that produced the drugs and the firearms.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 1994, after receiving a tip from a confidential informant, the ATF commenced an investigation into possible federal narcotics and weapons violations by members of the Hessians Outlaw Motorcycle Gang. The ATF was told by the confidential informant that Hudson was an associate of the Hessian gang, and that he manufactured methamphetamine for the gang. During the course of the investigation, ATF undercover agents and the confidential informant visited the Hessians' alleged "clubhouse" to gather incriminating information. The informant discussed with Hudson the possible purchase of methamphetamine and the possible trade of methamphetamine for ephedrine, an ingredient of methamphetamine. The informant also witnessed Hudson trade methamphetamine for glassware that might be used in the manufacture of methamphetamine. Shortly thereafter, the informant purchased 1/16 of an ounce of methamphetamine from Hudson.

The investigation of the Hessian gang culminated in the procurement of several federal search warrants and arrest warrants for several gang members. The ATF did not, however, obtain a federal arrest warrant or

search warrant against defendant Hudson. The agent in charge of the investigation, Agent Larry Bettendorf, had contacted the United States Attorney's office and had learned that federal prosecutors would not prosecute Hudson based on the evidence the ATF had collected against him. In addition, Agent Bettendorf believed that he did not have sufficient evidence to obtain a search warrant for Hudson's house, since Hudson's sale of methamphetamine had taken place months earlier and at a different locale: the Hessians' clubhouse.

Aware that federal prosecutors did not plan to prosecute Hudson based on the evidence the ATF had collected, Agent Bettendorf contacted an Assistant District Attorney for Orange County to seek a state arrest warrant against Hudson. Based on the evidence that Hudson had sold $\frac{1}{16}$ of an ounce of methamphetamine to the ATF's confidential informant, Agent Bettendorf obtained a state arrest warrant for Hudson from the Orange County Assistant District Attorney. At Hudson's suppression hearing, Agent Bettendorf testified that he did not "normally" apply for state arrest warrants. The Orange County Assistant District Attorney testified at the hearing that it was not "usual" for federal ATF agents to ask him for the issue of state arrest warrants, but that it was "not the first time" it had occurred. He testified that the sale of any illegal narcotic is a felony in California.

All of the warrants against the Hessian gang, including the state arrest warrant against Hudson, were executed on September 9, 1994. Both federal and state law enforcement agents executed the state arrest warrant at Hudson's parents' house. At around 3:30 a.m., the officers gathered near the house. At the time Hudson's arrest was executed, the Drug Enforcement Administration ("DEA") agent in charge of the arrest operation possessed the following information with respect to Hudson and his alleged associates in the Hessian gang: One of the ATF undercover agents who had participated in the investigation had heard Hessian gang members make statements of "anger and antipathy" about law enforcement officials and had heard them admit their involvement

in violent crimes. The ATF undercover agent had also been told by gang members that he would be killed if he were discovered to be a law enforcement officer. At the time of Hudson's arrest, the state and federal officials believed Hudson was an associate of the Hessian gang. They also knew that Hudson had a prior federal drug conviction, and knew that he had sold methamphetamine to the informant. In addition, the informant had told the DEA agent in charge of Hudson's arrest that he had previously seen firearms and glassware associated with methamphetamine manufacture in Hudson's bedroom at his parents' house.

At the time the officers approached the house, a light or television was on in one of the bedrooms. One of the officers knocked loudly on Hudson's front door and announced their presence and purpose. The front door was unlatched, and swung open with the officer's knock. Without waiting for a response, the officers immediately entered the house.

The officers first moved through the house in a security sweep. They entered every room and secured the individuals they found. The officers located Hudson in the southwest bedroom. He was standing in one corner of the room. The officers ordered him out of the room, handcuffed him, removed him from the house, and continued their sweep.

After the officers had completed their sweep, one of them returned to the room to conduct a search incident to arrest. About three minutes passed between the arrest and the agent's return to the room. On the ground where Hudson had been standing lay a rifle case. The agent opened the rifle case and found a rifle. In one corner of the room was a table, on top of which sat glassware that appeared to the agent to contain methamphetamine. Agent Bettendorf was contacted and informed about the rifle and the glassware, and he told the officers on site that he would seek a search warrant based on the discovery of those materials. Before a search warrant was obtained, however, officers moved the glassware to the front lawn, citing concerns about the potential toxicity and flammability of the chemicals contained in the glassware. A state lab technician

subsequently arrived to obtain samples of the substances.

Although state and federal officials had jointly executed a state arrest warrant, the Orange County Assistant District Attorney never prosecuted Hudson on state charges. At Agent Bettendorf's request, the Assistant District Attorney dismissed the state charges because federal prosecutors had elected to indict Hudson on federal charges. Hudson was charged in a three-count federal indictment with intent to distribute methamphetamine, use of a firearm during a drug-trafficking crime, and being a felon in possession of a firearm.

Hudson initially moved to suppress the evidence found at his house on grounds that the state arrest was merely a pretext for the agents to search for evidence of federal crimes. Thereafter, he supplemented his motion to suppress, alleging that the ATF agents had violated the knock and announce statute, 18 U.S.C. § 3109, and that the search of the rifle case and the glassware was invalid because it was conducted without a search warrant. The district court denied both Hudson's initial and supplemental motions to suppress.

Hudson entered a conditional guilty plea to two of the three counts contained in the indictment: possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Hudson timely appealed.

## ANALYSIS

### 1. Whether the arrest was a pretext for the search

■ Hudson initially argued that his arrest under a state warrant was a mere pretext to search his house for evidence to support federal charges. Following oral argument in this appeal, we withdrew the case from submission pending the Supreme Court's decision in *United States v. Whren,* 53 F.3d 371 (D.C.Cir.1995), *cert. grant-*

ed, ⸺ U.S. ⸺, 116 S.Ct. 690, 133 L.Ed.2d 595, *aff'd*, ⸺ U.S. ⸺, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). After the Supreme Court issued its opinion in *Whren,* Hudson moved to present supplemental briefing on the application of *Whren* to this case. In his supplemental brief, Hudson raises an alternative argument: He contends that we should perform the "balancing" analysis described in *Whren* as applicable to "searches or seizures conducted in an extraordinary manner." We review de novo the lawfulness of a search and seizure, and we review for clear error the district court's underlying factual findings. *United States v. Hernandez,* 55 F.3d 443, 446 (9th Cir. 1995) (*citing United States v. Becker,* 23 F.3d 1537, 1539 (9th Cir.1994)).

■ It is a well-settled principle that " 'an arrest may not be used as a pretext to search for evidence without a search warrant where one would ordinarily be required under the Fourth Amendment.' " *United States v. Mota,* 982 F.2d 1384, 1386 (9th Cir.1993) (*quoting Williams v. United States,* 418 F.2d 159, 161 (9th Cir.1969), *aff'd,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971)).

■ In deciding the standard we must apply to determine whether an arrest is pretextual, we note that the various standards reflected in our past decisions appear to have been superseded by the Supreme Court's recent decision in *Whren v. United States,* ⸺ U.S. ⸺, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).[1] In *Whren,* the Supreme Court clarified the proper test for determining whether a temporary traffic stop was a pretext for a search. The Court in *Whren* held that a traffic stop is not pretextual where a there is "probable cause to believe that a violation of law has occurred." *Whren,* ⸺ U.S. at ⸺, 116 S.Ct. at 1773.

In *Whren,* police officers temporarily detained a motorist whom the officers had probable cause to believe had committed a civil traffic violation. In the course of the temporary detention of the motorist and his

---

1. We note that a new judicial rule governing criminal procedure is to be applied retroactively to all cases, state and federal, that are pending on direct review or otherwise not final at the time the rule is announced. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).

passenger, the officers, members of an undercover vice squad, spotted what appeared to be crack cocaine in plain view inside the vehicle. Charged with various federal narcotics violations, the defendants in *Whren* moved to suppress the drug evidence on grounds that the officers' traffic stop was a mere pretext to search their car for evidence of drugs.

The Supreme Court upheld the validity of the traffic stop on grounds that probable cause indisputably existed to support the stop. The *Whren* court thus reduced the pretext inquiry to a "probable cause" inquiry, explaining that "the constitutional reasonableness of traffic stops" is to be determined through "an ordinary, probable-cause Fourth Amendment analysis." *Id.* at ——, 116 S.Ct. at 1774.

The Court in *Whren* expressly rejected a subjective test of pretext, flatly dismissing the notion that "ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred." *Id.* at ——, 116 S.Ct. at 1773 (distinguishing *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987), and *New York v. Burger*, 482 U.S. 691, 716–17, n. 27, 107 S.Ct. 2636, 2651, n. 27, 96 L.Ed.2d 601 (1987), cases involving searches conducted "in the absence of probable cause."). Indeed, the Court emphasized that it had "never held . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but [had] repeatedly held and asserted the contrary." *Whren,* —— U.S. at ——, 116 S.Ct. at 1774 (citations omitted).

Having concluded that "[s]ubjective intentions [of law enforcement officials] play no role in ordinary, probable-cause Fourth Amendment analysis," the Court next rejected the defendants' proposed test of pretext: The defendants insisted that a stop should be deemed pretextual if "the officer's conduct deviated materially from usual police practices, so that a reasonable police officer in the same circumstances *would not have made the stop* for the reasons given." *Id.* (emphasis added). The Court rejected this purportedly "objective" standard. It explained that the standard was "plainly and indisputably driven by subjective considerations," since, "[i]nstead of asking whether the individual officer had the proper state of mind, the petitioners would have us ask, in effect, whether (based on general police practices) it is plausible to believe that the officer had the proper state of mind." *Id.* Such an inquiry, opined the Court, would ignore the "Fourth Amendment's concern with 'reasonableness,' [which] allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Id.* at ——, 116 S.Ct. at 1775. The standard would also substitute "police enforcement practices," which "vary from place to place and from time to time" for Fourth Amendment search and seizure standards, which are not "so variable." *Id.*

If we conclude that *Whren* governs our analysis of the arrest in this case, then the Supreme Court's firm rejection of this standard—whether "a reasonable police officer in the same circumstances would [ ] have made the stop for the reasons given"—appears to foreclose Hudson's first argument: that the ATF officers would not have arrested Hudson, absent their desire to search Hudson's house, because the state drug charge was not a "major offense" for which the ATF would otherwise have arrested him.

We acknowledge that *Whren* involved a somewhat different context from that involved here: Whereas *Whren* set forth the standard for determining whether a *traffic stop* is pretextual, we are confronted here with a defendant's allegation that his *arrest* was pretextual. In our view, however, the *Whren* analysis governs this case.

We begin by noting that, in determining whether police action is a mere pretext for a search, we have long followed identical principles in both the traffic stop context and the arrest context. *Compare Mota,* 982 F.2d at 1385 (arrest), and *United States v. Smith,* 802 F.2d 1119 (9th Cir.1986) (arrest), *with Hernandez,* 55 F.3d at 445 (traffic stop); *United States v. Millan,* 36 F.3d 886 (9th Cir.1994) (traffic stop), and *United States v. Cannon,* 29 F.3d 472 (9th Cir.1994) (traffic stop).

What is more significant, however, is that *Whren* 's rationale dictates application of the

*Whren* standard to the arrest in this case. *Whren* made clear that where "police conduct [ ] is justifiable on the basis of probable cause to believe that a violation of law has occurred," we may not inquire into whether the officer's behavior had improper motives or deviated from the typical practice of reasonable officers. Because the police action in this case—arrest—is subject to "an ordinary, probable-cause Fourth Amendment analysis," *Whren,* —— U.S. at ——, 116 S.Ct. at 1774, we conclude that *Whren* sets forth the applicable standard for arrests alleged to be pretextual.

■ Applying the *Whren* standard here, we conclude that Hudson's arrest was supported by probable cause. The evidence Agent Bettendorf presented to the Orange County Assistant District Attorney demonstrated adequate probable cause to believe that a felony drug sale had occurred. Hudson does not contend that there was a lack of probable cause to support the state warrant, nor does he suggest that the warrant was improperly obtained. Because the ATF agent obtained the arrest warrant pursuant to a showing of probable cause, we conclude, following *Whren,* that the arrest was valid.

■ Hudson's alternative argument rests on dicta in *Whren.* In his supplemental brief, Hudson contends that the facts of this arrest and search make it subject to the "balancing" analysis *Whren* suggested would be applicable to "searches or seizures conducted in an extraordinary manner." *Id.* at ——, 116 S.Ct. at 1776.

We disagree because, in our view, the police action in this case does not fall under the "rare exception" of cases involving "searches and seizures conducted in an extraordinary manner." *Id. Whren* acknowledged that "in principle every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors." The Court explained, however, that "the result of that balancing is not in doubt" where probable cause exists to support the police action in question. *Id.* It did distinguish "rare exceptions" to this principle: cases where probable cause existed but where a balancing of government interests against a suspect's interests was necessary

because the "search[ ] or seizure[ ] [had been] conducted in an extraordinary manner, unusually harmful to an individuals's privacy or even physical interests." *Id.* Such cases include seizure by means of deadly force, *id.* (citing *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)); unannounced entry into a home, *id.* (citing *Wilson v. Arkansas,* —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)); entry into a home without a warrant, *id.* (citing *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)); or physical penetration of the body, *id.* at ——–——, 116 S.Ct. at 1776–77 (citing *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)).

Hudson insists that such a "balancing" is required here because this case involved a dwelling and because the officers "entered the premises for the purpose of a search, even though they only had a valid warrant for his arrest for an unrelated minor crime." He invokes *Wilson v. Arkansas,* —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). In that case, state law enforcement officers walked into a defendant's home and announced that they were there to arrest her and search her home. Holding that the "knock and announce" principle that existed at common law is part of the Fourth Amendment's "reasonableness" analysis, the Supreme Court reversed the defendant's conviction, remanding for a determination whether the officers' actions were "unreasonable" under the Fourth Amendment. *Id.* at ——–——, 115 S.Ct. at 1918–19.

We begin by noting that Hudson's latter argument is foreclosed by the *Whren* analysis, which stated unequivocally that officers' subjective motives are not relevant where probable cause exists to support a particular police action. *Id.* at ——, 116 S.Ct. at 1773. We next note that, although the police action in this case was an arrest at a dwelling, nonetheless the officers had probable cause to arrest Hudson. And, as we explain below, the officers in this case, unlike the officers in *Wilson,* did knock and announce their authority and purpose, and were therefore justified in not awaiting a response before entering.

## 2. The knock and announce requirement

Hudson's next challenge to the denial of his motion to suppress is that the arresting agents violated the "knock and announce" requirement of 18 U.S.C. § 3109 at the time they executed the state arrest warrant against him. He argues that it was illegal for the officers to enter his house through the open door immediately after knocking on that door and announcing their identity. He disagrees with the district court's conclusion that the officers' failure to await a response was justified by "mild exigency."

 We review de novo a district court's determination of the validity of a protective sweep, including compliance with the "knock and announce" requirement of 18 U.S.C. § 3109. *United States v. Arias,* 923 F.2d 1387, 1391 (9th Cir.) (*citing United States v. McConney,* 728 F.2d 1195, 1204–05 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)), *cert. denied,* 502 U.S. 840, 112 S.Ct. 130, 116 L.Ed.2d 97 (1991). Whether exigent circumstances justified a failure to adhere to the knock and announce provisions of 18 U.S.C. § 3109 is a mixed question of fact and law that we review de novo. *United States v. Becker,* 23 F.3d 1537, 1539 (9th Cir.1994) (*citing McConney,* 728 F.2d at 1204–05).

The knock and announce rule is contained in 18 U.S.C. § 3109, which provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109.

The statute requires that an officer seeking to enter a house to execute a warrant must give notice of his purpose and authority, and must be refused entry before entering the house.

 We have recognized, however, that "compliance with section 3109's requirements may be excused by exigent circumstances." *McConney,* 728 F.2d at 1199 (*citing United States v. Whitney,* 633 F.2d 902, 908 (9th Cir.1980), *cert. denied,* 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981)). Exigent circumstances are "'those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Arias,* 923 F.2d at 1391 (*citing United States v. Alfonso,* 759 F.2d 728, 742 (9th Cir.1985)).

 In particular, we have held that "mild exigency" is sufficient to justify simultaneous or immediate entry when entry can be accomplished without any physical destruction of property. *Becker,* 23 F.3d at 1540 (citation omitted). *Accord Arias,* 923 F.2d at 1391 (citation omitted). Mild exigency exists where "there is a likelihood that the occupants [of the dwelling] will try to escape, resist, or destroy evidence." *McConney,* 728 F.2d at 1206. We have cautioned, however, that "[w]hether the circumstances present sufficient exigency [to justify the officers' actions] necessarily involves judgment. An unjustified but sincere fear by an officer cannot excuse noncompliance. Otherwise, the protection of the occupants' privacy interest would depend on no more than an officer's anxiety." *Id.*

 Applying this standard to the facts of this case, we conclude that mild exigency existed to excuse the officers' failure to await refusal before entering the house. On the basis of the information they possessed at the time they executed the arrest warrant, the officers could have inferred a "likelihood" that the occupants would "try to escape, resist, or destroy evidence." *Id.*

The DEA agent supervising Hudson's arrest was aware of several facts suggesting that Hudson was likely to attempt escape or to resist arrest. That agent knew that Hudson had recently sold methamphetamine to a confidential informant, and had a prior conviction for a drug offense. Furthermore, that same confidential informant had seen firearms and drug paraphernalia in Hudson's bedroom on a previous occasion.

We first note that a defendant's known or suspected involvement with "offenses [that] often involve the possession of firearms" may support, at least in part, a finding of mild exigency. *Id.* We have characterized drug dealing as such an offense. *Id.* In this case, Hudson's prior conviction for a drug offense and the evidence of his recent drug dealing indicated a good possibility that he might be currently involved in such activities. *Cf. United States v. Mendonsa*, 989 F.2d 366, 371 (9th Cir.1993) (defendant's prior state criminal conviction for armed robbery insufficient to justify officers' breaking down of defendant's front door; forced entry requires "more specific inferences of exigency" than the "mild exigency" standard required for non-destructive entry).

Second, and more significant, is the recent observation of firearms in Hudson's bedroom. That information, supplied by the ATF confidential informant who had cooperated with officials by going on an investigatory drug buy, offered solid support for the officers' belief that Hudson was likely to have firearms in his bedroom. We have held that a suspect's possession of firearms suffices to create a mild exigency. *United States v. Reed*, 15 F.3d 928 (9th Cir.1994). In *Reed*, police officers forced their way into the defendant's hotel room, an action requiring a *higher* threshold of exigency than mere mild exigency. There, we concluded that exigency was sufficient to support a forcible entry where the police knew the suspect had a criminal record and, on the basis of a previous search of the defendant's hotel room that produced a firearm, suspected that he might be armed. *Id.* at 934. *Cf. Becker*, 23 F.3d at 1541 (dicta stating that not even mild exigency existed where the only basis for suspecting a defendant possessed firearms was the fact that weapons had been found during previous searches of his drug-dealing associates' homes).

We conclude that the combination of these factors supported the officers' belief that a mild exigency existed, since these factors permitted an inference that there was a likelihood that Hudson might escape or resist arrest. *See also McConney*, 728 F.2d at 1206 (holding that combination of factors could support a finding of mild exigency).

Our previous decisions reflect a finding of "mild exigency" on comparable facts. In *McConney*, we concluded a mild exigency existed where officers knew that the defendant had a prior conviction for a violent felony, was a drug dealer, was charged with racketeering, and had previously stated that he would "protect" members of his motorcycle gang. *Id.* Similarly, in *Arias*, we held that mild exigency existed where officers had information that the defendant's house was used to store drugs, and where the officer in charge knew the house was occupied at that moment, and feared that the occupants might be destroying evidence or arming themselves. *Arias*, 923 F.2d at 1391.

### 3. The warrantless search

 Hudson's final challenge to the denial of his motion to suppress is that the warrantless search of his bedroom following his arrest was invalid. His challenge is twofold: He first contends that the "search incident to arrest" and "plain view" doctrines do not apply in cases where an arrest warrant is executed for a specific crime. He also urges, in the alternative, that the search exceeded the scope of a proper "search incident to arrest" or a "plain view" search. In the context of searches incident to arrest and plain view searches, we review de novo the district court's application of established facts to legal standards. *United States v. Turner*, 926 F.2d 883, 887 (9th Cir.) (citation omitted), *cert. denied*, 502 U.S. 830, 112 S.Ct. 103, 116 L.Ed.2d 73 (1991).

We disagree with Hudson's contention that *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932), prevents the application of the "search incident to arrest" and "plain view" exceptions to the warrant requirement. We acknowledge that *Lefkowitz* invalidated a warrantless search that was undertaken during an arrest. For two reasons, however, we reject Hudson's contention that *Lefkowitz* precludes the "search incident to arrest" and "plain view search" exceptions to the warrant requirement. We first point out that *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and

lower federal court decisions following it, developed the "search incident to arrest" doctrine decades after *Lefkowitz*. Similarly, the "plain view" doctrine is well settled, *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), and has emerged in its contemporary form decades after *Lefkowitz*. We next note that the search in *Lefkowitz*—where officers conducted a thorough and prolonged search of the defendant's premises—went well beyond the bounds of searches permitted under the contemporary "search incident to arrest" and "plain view search" doctrines.

 A "search incident to arrest" is an exception to the general rule against warrantless searches. *McConney*, 728 F.2d at 1206. The justification for permitting a warrantless search is the "need [of law enforcement officers] to seize weapons or other things which might be used to assault an officer or effect an escape, as well as the need to prevent the loss or destruction of evidence." *Id.* at 1206–07.

 A legitimate "search incident to arrest" is limited to the arrestee's person and to the area "within his immediate control," meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040 (internal quotation marks omitted). In determining whether a search is justified under the "search incident to arrest" exception, therefore, the critical inquiry is "whether the search ... was properly limited to the area within [the arrestee's] immediate control at the time of his arrest." *McConney*, 728 F.2d at 1207. In evaluating the validity of such a search, courts are to weigh such factors as the number of persons being arrested, the number of officers present, their physical positioning with regard to the arrestee and the premises being searched, the display of guns by the officers, and the distance between the arrestee and the place searched. *Id.* (citations

omitted). Since the Supreme Court's decision in *Chimel*, several legal rules have emerged to govern the "search incident to arrest." Some of those principles have application to this case.

 Concerning the temporal scope of the search, we have held that a "search incident to arrest" must be conducted "at 'about the same time as the arrest.'" *Turner*, 926 F.2d at 887 (quoting *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987)). That search may be conducted shortly after the arrestee has been removed from the area, provided that (1) the search is restricted to the area that was "within the arrestee's immediate control when he was arrested," *Turner*, 926 F.2d at 888, and (2) events occurring after the arrest but before the search incident to arrest did not render the search unreasonable. *Id.* In *Turner*, for example, we held a search incident to arrest was not unreasonable where only a few minutes had passed between the arrest and the search, the defendant was taken to the next room out of concern for the officers' safety, a gun was found in the room where the defendant had been arrested, and the defendant was held near the site of the arrest. *Id.*

 With respect to the physical scope of the search, we have held that a search incident to arrest may "encompass a room from which the arrestee has been removed." *Id.* at 887–88 (limiting holding to "the narrow facts of a short time span and the arrestee's close proximity"). We have also held that a search incident to arrest may justify the opening of containers found within the physical area covered by the search. *Andersson*, 813 F.2d at 1455 (citing *United States v. Burnette*, 698 F.2d 1038, 1049 (9th Cir.) (citations omitted), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983)).[2] The rationale for searches of open or closed containers is "not that the arrestee has no privacy interest in the container, but

---

2. Defendant urges that under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the seizure of the rifle case and the glass containers may have been permissible, but their search was not. We disagree. As the Supreme Court explained in *New York v. Belton*, *Chadwick* is inapposite, since it did not "in-

volve[] an arguably valid search incident to a lawful custodial arrest," but instead involved a search of a locked trunk more than an hour after the suspects had been taken into custody. *New York v. Belton*, 453 U.S. 454, 461–62, 101 S.Ct. 2860, 2864–65, 69 L.Ed.2d 768 (1981).

that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *New York v. Belton*, 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) (upholding search incident to arrest where officer searches jacket of one of suspects arrested during traffic stop).

With these principles in mind, we consider the two items of evidence Hudson sought to suppress below.

■ We begin by noting that little time passed between the moment Hudson was arrested and the time the officer returned to his bedroom to conduct the search. After they arrested Hudson and removed him from the room, the officers quickly completed their sweep of the house, which was necessary to the security of the officers. One of the agents then returned to Hudson's bedroom and searched the rifle case. The record indicates that a mere three minutes elapsed between Hudson's arrest and the search of the rifle case. *Cf. Turner*, 926 F.2d at 888 (*citing with approval United States v. Fleming*, 677 F.2d 602, (7th Cir.1982), where the Seventh Circuit held that five minutes was a permissible lapse of time between arrest and search for weapons incident to arrest).

We next consider the physical circumstances of the search. When Hudson was called out of his bedroom and arrested, one of the arresting officers noticed a rifle case near his feet. Although the rifle was contained in a case, it was nevertheless well within Hudson's reach, and thus constituted a potential danger to the arresting officers. The physical proximity of the rifle thus supports a conclusion that the search fell squarely within the spatial limitations of a search incident to arrest.

■ The record is less clear with respect to the glassware. We know that the glassware was on a table located in a corner of Hudson's bedroom, but the record does not make clear Hudson's position relative to that corner when he was arrested. Although the district court found that the glassware was within Hudson's "grab area," the precise distance between Hudson and the glassware is unclear. We need not rely on the "search

incident to arrest" exception, however, since the record reflects that the glassware fell within the "plain view" exception to the warrant requirement.

■ The "plain view" exception to the warrant requirement allows for the seizure of evidence in plain view where two criteria are met: (1) "the initial intrusion must be lawful" and (2) "the incriminatory nature of the evidence must be immediately apparent to the officers." *United States v. Simpson*, 10 F.3d 645, 647 (9th Cir.1993), *overruled on other grounds*, —— U.S. ——, 115 S.Ct. 477, 130 L.Ed.2d 391 (1994). Because we concluded above that the arrest of Hudson was valid, we conclude that the first criterion of the "plain view" doctrine is satisfied.

■ The second criterion is met where the officer had " 'probable cause to associate the property with criminal activity.' " *Texas v. Brown*, 460 U.S. 730, 741–42, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality) (*quoting Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). By requiring that the incriminatory nature of the evidence be "immediately apparent," the doctrine does not require that the officer "be possessed of near certainty as to the seizable nature of the items." *Brown*, 460 U.S. at 741, 103 S.Ct. at 1543. Instead, probable cause "is a flexible, common-sense standard," requiring only that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband ... or useful evidence of a crime." *Id.* at 741–42, 103 S.Ct. at 1543 (*quoting Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)).

We hold that the second criterion of the plain view requirement was satisfied here. The officer spotted the glass containers and recognized them as the type of glassware often associated with methamphetamine manufacture. Moreover, based on his law enforcement experience, he was familiar with the appearance of methamphetamine, and quickly recognized the substance as methamphetamine.

## CONCLUSION

We affirm the district court's denial of Hudson's motion to suppress.

REINHARDT, Circuit Judge, dissenting:

The majority concludes that, under the Supreme Court's recent decision in *Whren v. United States,* —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the subjective motives of police officers "are not relevant where probable cause exists to support a particular police action." The majority also interprets *Whren* to mean that searches and seizures supported by probable cause are not subject to a Fourth Amendment balancing analysis except under the "rare exception" of "searches and seizures performed in an extraordinary manner." Having determined that Hudson's arrest was supported by probable cause, and that the entry of Hudson's home was not conducted in an "extraordinary manner," the majority then concludes that the search and seizure were constitutional.

While the majority is correct in concluding that *Whren* constrains our decision in the present case to some extent, it inadvertently extends that decision considerably beyond its actual scope. As the Court acknowledged in *Whren,* reasonableness remains the touchstone of all Fourth Amendment analysis. Here, given the nature of the police operation that occurred, we are required to examine closely all of the facts surrounding the invasion of the Hudson family home. Only by doing so can we properly address the question of reasonableness. In this case, we must perform a most careful constitutional balancing analysis of all relevant factors, notwithstanding the existence of probable cause. Such an analysis, even without regard to the officers' motives in this case, leads inevitably to the conclusion that the overwhelmingly intrusive manner in which federal agents used their federal authority to arrest Hudson on a state charge and to collect evidence regarding a federal offense was unreasonable and therefore unconstitutional.

*Whren* addressed the particular question of "whether the *temporary detention of a motorist* who the police have probable cause to believe has committed a *civil traffic violation* was inconsistent with the Fourth Amendment's prohibition against unreasonable seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws." *Whren,* —— U.S. at —— – ——, 116 S.Ct. at 1771–72 (emphasis added). In *Whren,* plainclothes officers performed a traffic stop, contemporaneous with an observed traffic violation, and "immediately observed two large bags of what appeared to be crack cocaine" in the passenger's hands. *Id.* at ——, 116 S.Ct. at 1772. That was the complete extent of the intrusion involved. The present case, by contrast, involves the pre-dawn raid of the home of Hudson's parents by a large federal task force pursuant to a state arrest warrant for their son issued because of a four-month-old sale of one-sixteenth of an ounce of narcotics—a quantity so small that federal prosecutors refused to bring *any* charges. Without even waiting for a peaceful response at the door, a twelve-member team of state and federal agents wielding weapons, search lights, and a bulletproof ballistic shield entered the family home, detained and handcuffed Hudson's parents and younger brother, and videotaped the interior of their home, occupying it like a military force for over eight hours. In the Fourth Amendment context, where reasonableness is *always* the test of constitutionality, it is precisely such factual occurrences that define the boundary between what is constitutional and what is not.

*Whren* is not a case that dealt with core Fourth Amendment values. In addressing the particular question posed by traffic stops of an automobile traveling on a public road, the *Whren* Court did not purport to evaluate the critical and highly sensitive constitutional interests that are implicated by heavily armed, nighttime intrusions into the sanctity of a family home in order to arrest a family member. Nor did the Court consider whether a gross disproportionality between the severity of an offense and the intrusiveness of the subsequent search and seizure could render a search unreasonable within the meaning of the Fourth Amendment. These considerations, as well as others, dictate not only a different result in this case, but also that we reach that result by applying the kind of delicate balancing analysis appropri-

ate to determining reasonableness under the Fourth Amendment, rather than a broad and sweeping rule that disregards the particular circumstances of the case at issue.

It is well settled that individuals are entitled to greater Fourth Amendment protection in the privacy of their homes than in a motor vehicle. While the temporary detention of a motor vehicle and its occupants "interfere[s] with freedom of movement" and can create "substantial anxiety," and thus constitutes a "seizure" within the meaning of the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 656–57, 99 S.Ct. 1391, 1397–98, 59 L.Ed.2d 660 (1979), "the purpose of the stop is limited and the resulting detention quite brief" in most cases, and the resulting intrusion is "limited in magnitude compared to other intrusions." *Id.* at 655, 661, 99 S.Ct. at 1396, 1400. The consequences of such intrusions are "minimal," *id.*, particularly when compared to the intrusion that accompanies the invasion of one's home:[1] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134–35, 32 L.Ed.2d 752 (1972)). "The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment." *United States v. Becker*, 23 F.3d 1537, 1539 (9th Cir.1994) (quoting *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884 (9th Cir.1990)).

The recognition that a heavily armed predawn raid of a family home injures fundamental constitutional interests is only the beginning of what ought to be our analysis in this case. We must also consider the relationship between the severity of the offense that was offered to justify the search, and the intrusiveness of all of the aspects of the search that actually occurred. Gross disproportionality between the intrusiveness of a search or seizure and the relative importance of the underlying offense can, of course, render the search unreasonable and therefore unconstitutional, even when the search is supported by probable cause. *See Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985); *Franklin v. Foxworth*, 31 F.3d 873, 875–76 (9th Cir.1994); *see also Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989) (determining reasonableness under the Fourth Amendment requires careful attention to all facts and circumstances "including the severity of the crime at issue"). Similarly, both the timing and manner of the police conduct must be considered: "reasonableness depends on not only when a seizure is made, but also how it is carried out." *Garner*, 471 U.S. at 8, 105 S.Ct. at 1699; *Franklin*, 31 F.3d at 875.

*Whren* is not to the contrary. It remains perfectly clear that not every search or seizure is constitutional simply because it is supported by probable cause. As *Whren* itself acknowledges, a search or seizure must always be "reasonable" in light of "all relevant factors": "every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors." *Whren*, at ——, 116 S.Ct. at 1776. *Whren* makes it clear that, in the majority of cases, the existence of probable cause to believe that a traffic law has been violated will outweigh a citizen's privacy interest in avoiding "unsettling" and "inconvenient" police contact. *Id.* at ——, 116 S.Ct. at 1777 (quoting *Delaware v. Prouse*, 440 U.S. 648, 657, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979)). However, when a search or seizure supported by probable cause is performed in a particularly intrusive or harmful manner that calls into question the overall reason-

---

1. Whereas the occupants of a motor vehicle enjoy only "reduced expectations of privacy" owing to "the pervasive regulation of vehicles capable of traveling on the public highways," *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1985), individuals enjoy freedom and privacy in their homes that they enjoy nowhere else. *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092,

3096, 49 L.Ed.2d 1000 (1976) ("[T]he expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office."); *Stanley v. Georgia*, 394 U.S. 557, 568, 89 S.Ct. 1243, 1249–50, 22 L.Ed.2d 542 (1969) (government's otherwise broad power to regulate obscenity "simply does not extend to mere possession by the individual in the privacy of his own home").

ableness of the police action, courts must balance "all relevant factors" to determine whether the search or seizure satisfies the fundamental requirement of reasonableness imposed by the Fourth Amendment. *Id.* at ——, 116 S.Ct. at 1776. Indeed, *Whren* itself cites various Supreme Court decisions in which this familiar Fourth Amendment balancing analysis was necessary notwithstanding the existence of probable cause. *See id.* at —— ——, 116 S.Ct. at 1776–77 (citing *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); and *Wilson v. Arkansas,* —— U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)).

I note a variety of factors that compel a careful balancing analysis in this case.

These include the facts that: the nighttime raid of a home was involved; the agents failed to announce themselves before entering the home;[2] they occupied the Hudson home for over eight hours, during which time the Hudson family was forced either to remain on a couch under police supervision or to seek other shelter in the middle of the night;[3] there was a glaring disproportionality between the intrusiveness of the raid and the four-month-old sale of sixty dollars' worth of drugs that was offered to justify the raid;[4] and an arrest of the son of the owners of the home, not a search of the premises, was the ostensible justification for the pre-dawn raid. In focusing exclusively on the existence of probable cause, the majority fails to consider these clearly relevant factors. Instead, my colleagues rely upon a discussion in *Whren* that it correctly charac-

**2.** The "simple and ancient requirement" that officers must announce themselves before entering a home, thereby giving the occupants an opportunity to cooperate and to admit the officers peacefully, "is based upon much more than a concern that our privacy will be disturbed. It is based upon concern for our safety and the safety of our families." *Becker,* 23 F.3d at 1540–41 (quoting *United States v. Lockett,* 919 F.2d 585, 592 (9th Cir.1990) (Fernandez, J., concurring)); *see also, e.g., Miller v. United States,* 357 U.S. 301, 313, 78 S.Ct. 1190, 1197–98, 2 L.Ed.2d 1332 (1958); *United States v. Bustamante-Gamez,* 488 F.2d 4, 9 (9th Cir.1973). The Supreme Court has recently made it clear that this requirement, which is codified at 18 U.S.C. § 3109, is also one of *constitutional* dimensions, the violation of which must be considered in determining the constitutionality of a search. *See Wilson v. Arkansas,* —— U.S. ——, —— ——, 115 S.Ct. 1914, 1915–16, 131 L.Ed.2d 976 (1995). Although I do not dispute the majority's conclusion that a "mild exigency" excused the government's noncompliance with the knock-and-announce requirement in this case, the unannounced entry of a home nevertheless implicates interests that the Fourth Amendment was designed to protect. Unannounced police invasions threaten to replace the sense of security and tranquility that we enjoy in our homes with a sense of fear. "[T]he Fourth Amendment protects us from that fear as much as it protects our privacy." *Becker,* 23 F.3d at 1540. Even if a violation of the knock-and-announce requirement is excused by the existence of an exigency, both the violation and the exigency that excuses it must still be weighed as part of an overall balancing of the interests that purportedly justify the search against the intrusion committed upon the privacy, safety, and property interests protected by the

Fourth Amendment. *See Wilson,* —— U.S. at ——, 115 S.Ct. at 1919; *infra* note 5 (explaining why *Wilson* cannot be distinguished from the present case).

**3.** *Cf. Franklin v. Foxworth,* 31 F.3d 873, 875–78 (9th Cir.1994) (forcing ill and elderly man to remain semi-nude on a couch for an hour rendered search of home unreasonable).

**4.** The combined importance of the first and third of these factors—the special protections afforded by the Fourth Amendment to persons in their homes, and the need for some reasonable proportionality between the severity of the offense and the intrusiveness of the resultant search and seizure—is aptly illustrated by the Supreme Court's decision in *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In *Welsh,* police learned that an erratically driven car had swerved off the road and that its driver was either inebriated or sick. After checking the vehicle's registration, police proceeded without a warrant to Welsh's home, where they were admitted by Welsh's stepdaughter, and found Welsh lying naked in bed. The Court held that probable cause could not justify "a warrantless, nighttime entry into the petitioner's home to arrest him for a civil traffic offense." *Id.* at 754, 104 S.Ct. at 2100. Such an intrusion, it explained, was "clearly prohibited by the special protection afforded the individual in his home by the Fourth Amendment." *Id.* Although the warrantless entry of Welsh's home could have been justified by the existence of both probable cause and exigent circumstances, the Court refused to find that any exigency existed in light of the "relatively minor" nature of Welsh's offense: "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying

terizes as "dicta" for the proposition that searches and seizures supported by probable cause are subject to a balancing analysis only if they are conducted "in an extraordinary manner," and they conclude that the present case does not fall within that "rare exception." But the *Whren* dictum compels no such result. Understood in a manner consistent with precedent, an "extraordinary" search or seizure, in the sense in which the Court used that term in *Whren*, is simply one that is "out of the ordinary"—such as an armed assault on a family home in the middle of the night in order to arrest someone for a sixty-dollar drug sale that had occurred over four months earlier at a different location. The notion that searches or seizures supported by probable cause and conducted in an *ordinary* manner are generally constitutional is hardly novel, *see, e.g., Winston v.*

*Lee,* 470 U.S. 753, 759, 105 S.Ct. 1611, 1615–16, 84 L.Ed.2d 662 (1985), and certainly does not justify rejection of a balancing analysis in the present case.[5] What is truly "extraordinary" in this case is the notion that the search conducted here was an ordinary one.

When all of the facts are considered, it is plain that the search and seizure that occurred in this case was "unreasonable." In deciding to raid Hudson's parents' home, federal agents relied upon an informant's statements that Hudson manufactured methamphetamine for the Hessians and that he had seen firearms in the Hudsons' residence on some unspecified occasions in the past. This informant had purchased one-sixteenth of an ounce of methamphetamine from Hudson and asserted that he had observed Hudson trading methamphetamine for materials used in the manufacture of methamphetamine. Yet

offense for which the arrest is being made." *Id.* at 750, 753, 104 S.Ct. at 2097, 2099.

5. Moreover, even under the majority's narrow, rule-based approach to determining whether a balancing analysis is necessary, the mere fact that the officers failed to announce themselves before entering the Hudson home requires such an analysis in this case. In *Wilson v. Arkansas,* — U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995)—cited with approval in *Whren* as an example of a case involving a search conducted in an "extraordinary manner"—the Court held that the unannounced entry of a private home and the execution therein of search and arrest warrants were subject to a balancing analysis. In that case, Arkansas police obtained warrants to search Wilson's home and to arrest Wilson. The officers opened an unlocked screen door and found the main door to her home open. Only while entering her home did the officers identify themselves and state that they had a warrant. Once inside, the officers seized various narcotics and narcotics paraphernalia, a firearm, and ammunition. *Id.* at —— ——, 115 S.Ct. at 1915–16. The state courts rejected Wilson's argument that the Fourth Amendment requires police to knock and announce themselves prior to entering a home. *Id.* at ——, 115 S.Ct. at 1916. Holding that failure to comply with the knock-and-announce requirement could render a search or seizure in a home unconstitutional, the Supreme Court reversed and remanded for determination of whether the search was "unreasonable" in light of the officers' failure to announce prior to entry. *Id.* at —— ——, 115 S.Ct. at 1918–19. In short, because police failed to announce themselves before entering Wilson's home through an open door, a reasonableness analysis was appropriate in *Wilson* even though the search and seizure in question had been conducted pursuant to a warrant.

*Wilson* is directly controlling and requires a reasonableness analysis in the present case. The majority attempts to distinguish *Wilson* on the ground that the officers in the present case "did knock and announce their authority and purpose, and were therefore justified in not awaiting a response before entering." This distinction is completely groundless, both as a matter of fact and as a matter of law. First, as a matter of fact, the manner of entry in the two cases cannot be distinguished. In both cases, the police were required to open an unlocked screen door in order to reach the main door of the residence, but in neither case were they required to open the main door. In *Wilson,* the main door was open, *id.* at ——, 115 S.Ct. at 1915, while in the present case, the main door was unlatched and opened with the force of an officer's knock. In both cases, the officers knocked and announced themselves, but in neither case did they await a response before entering. Second, as a matter of law, the fact that the officers "did knock and announce their authority and purpose" could not have "therefore justified" their failure to await a response: it is an obvious and indispensable part of the knock-and-announce requirement that police *await a response* before entering. *See, e.g., id.* at ——, 115 S.Ct. at 1919 ("[A] search or seizure of a dwelling might be constitutionally defective if police officers enter without *prior* announcement.") (emphasis added); *United States v. Ramirez,* 91 F.3d 1297, 1299 (9th Cir. 1996) (invalidating search in which police announced themselves over a loudspeaker system but "without waiting for a response, ... broke the window of the garage and began waving a gun through that window"); *United States v. Becker,* 23 F.3d 1537, 1539–42 (9th Cir.1994) (invalidating search in which police "loudly announced themselves and *simultaneously* kicked the door in and entered") (emphasis added).

as the majority notes, the totality of the evidence, including that provided by the informant, justified neither a federal arrest warrant nor any kind of search warrant: federal prosecutors refused to bring any charges against Hudson on the basis of the sixty-dollar drug sale, and the federal agent who requested the state arrest warrant understood that he could not obtain a search warrant for the Hudson home. The small transaction that supported the state charge had occurred over four months earlier and at a different location. Indeed, the state prosecutor responsible for obtaining the state arrest warrant described Hudson as "kind of a peripheral guy" who had sold "a small amount" of narcotics: as he explained, "apparently the federal government didn't want to handle a case that small."

Notwithstanding the lack of probable cause to search Hudson's home and the notable indifference of federal prosecutors to a case as "small" as Hudson's, at 3:35 in the morning, a twelve-member team of federal and state agents wielding a bulletproof ballistic shield and search lights stormed the home, searched and handcuffed Hudson's parents and younger brother, and detained them outside while sweeping the entire house. Hudson was found in his bedroom with his hands on his head; after removing him from his room, the officers performed a search of the room incident to his arrest, at which point they discovered the rifle and glassware that were admitted as evidence against him. Although Hudson's father gave written consent to a search of his entire home, the agents refused to search the remainder of the house or to leave until a federal search warrant was obtained at noon the following day—over eight hours from the time that the raid began. During that eight-hour period, an ATF agent arrived and videotaped the interior of the house while the family remained on a couch in their living room.

The heavily armed raid on a family home in the middle of the night in order to arrest one family member, and the attendant disruption of a family's peace and solitude, infringes on what may be our most deeply cherished privacy, safety, and property interests. When one adds the fact of the officers'

unannounced entry to the handcuffing and detention of the entire Hudson family, the videotaping of the contents of their home, and the militaristic occupation of their home that lasted over eight hours, it becomes difficult to imagine police conduct that could have struck more intrusively at the family's basic right of privacy and security. Nor can the magnitude of this intrusion be explained or justified on the ground suggested by the government—the risk that Hudson might resist violently. Safety concerns weighed *against* the decision to arrest Hudson at home: as ATF Special Agent Manna acknowledged, "it would have been safer to arrest the defendant ... outside an area that he is familiar with." And insofar as the agents were concerned by evidence that firearms were kept in the home, the *most dangerous* place to arrest Hudson was obviously at home.

Over the course of four months, the government had ample opportunity to arrest Hudson away from his home, away from any perceived threat to officer safety, and in a dramatically less intrusive manner. The truthful explanation for the awesomely intrusive approach that was actually taken—an explanation that the majority does not and cannot reject—is, of course, that the agents desired to collect evidence of other crimes. But that desire alone—lacking the support of a search warrant that the agents knew they could not obtain—cannot render reasonable the pre-dawn raid on a private home, and the intimidation of an entire family, simply to execute a state arrest warrant issued on account of a sixty-dollar drug sale that took place four months earlier in a different place. A blitzkrieg of the Hudson family home was plainly not a reasonable manner in which to arrest Hudson for a rather minor crime. I respectfully dissent.