[No. G021972. Fourth Dist., Div. Three. June 30, 1999.

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ARNOLD SUMMERS, Defendant and Appellant.

## COUNSEL

Alisa Shorago, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CROSBY, Acting P. J.**—Richard Arnold Summers lived in a small trailer.[1] When Anaheim police officers approached it to serve him with an arrest warrant, they encountered Selena Poer on the way out. She said she lived

---

[1]Summers pleaded guilty to various criminal offenses after his motion to suppress was denied.

there with Summers and another man who was in the nearby trailer park laundromat. She agreed to accompany the officers while they talked to Summers.

Inside the trailer the officers found Summers sleeping. They awakened him, and he identified himself. Told they had a warrant for his arrest, he stood up, put on his pants, and was handcuffed. As one officer put the cuffs on, the other kept an eye on Poer and watched for the possible return of the absent male occupant of the trailer.

One officer escorted Summers toward the door while the other patted down the bed where he had been sleeping. As he moved the pillow, he saw a sawed-off shotgun between the mattress and the headboard. No one was certain whether Summers was just inside or just outside the trailer door when the shotgun was first observed, but he was roughly 10 feet away.

Of course, finding the shotgun—contraband in itself in its sawed-off condition—considerably upped the ante on the service of the warrant. Concerned for their safety, the officers held Summers and Poer outside a minute or two while they awaited backup. Then police were dispatched after the man Poer said shared the trailer. They found him 50 to 100 feet away in the trailer park laundromat.

Satisfied he was not armed and that their safety had been assured, they went back into the trailer, and photographed, fingerprinted and seized the shotgun. Roughly 10 minutes elapsed between Summers's arrest and the seizure of the illegal shotgun.

■ Our concurring colleague views the issue here as a relatively momentous one. We do not. This is a simple *Chimel* v. *California* (1969) 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685] case to our way of thinking. When discovered, the gun was within the immediate area of the still-being-removed arrestee, there was a female present who was not previously known to the officers, and there was another male roommate somewhere nearby whose presence away from the immediate premises had not yet been confirmed.

We think the logic of *Chimel* is contrary to several of the decisions Justice Bedsworth espouses. The justification for *Chimel* searches is officer safety, not officer opportunism, i.e., a postarrest license to embark on a general search. (See, e.g., *U.S.* v. *Blue* (2d Cir. 1996) 78 F.3d 56 [search under mattress not lawful where two suspects in one-room apartment handcuffed prone on the floor two feet from the bed].) That is to say, where there is no

threat to the officers because the suspect has been immobilized, removed, and no one else is present, it makes no sense that the place he was removed from remains subject to search merely because he was previously there.

That said, though, we hasten to add this: This was not a cold arrest scene with a long-gone suspect. He was still being removed from the cramped premises; one roommate was present and free of police control, and another was unaccounted for when the weapon was chanced upon. This was a fluid situation in close quarters; and a court could properly find, as we do, that the circumstances justified reasonable precautions for the safety of everyone involved. As Professor LaFave's collection of cases in the area illustrates, the search that turned up this weapon would have been upheld in virtually all jurisdictions. (See 3 LaFave, Search and Seizure (3d ed. 1996) Entry and Search of Premises, § 6.3(c), p. 308.) The warrantless seizure of the weapon a few minutes later while the premises were still under the lawful control of the officers was similarly lawful.[2]

Judgment affirmed.

Rylaarsdam, J., concurred.

**BEDSWORTH, J.,** Concurring.—My colleagues have gotten the result right, but have approached that result so timorously as to water down the protection afforded law enforcement officers by the Constitution. There are occasions in which proper interpretation of the Fourth Amendment has the primary effect of protecting not our citizenry, but our law enforcement officers. (See, e.g., *Terry* v. *Ohio* (1968) 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] [stop and frisk]; *Pennsylvania* v. *Mimms* (1977) 434 U.S. 106 [98 S.Ct. 330, 54 L.Ed.2d 331] [ordering driver out of car in traffic stop]; *Maryland* v. *Buie* (1990) 494 U.S. 325 [110 S.Ct. 1093, 108 L.Ed.2d 276] [protective sweep of residence during in-home arrest]; *People* v. *Glaser*

---

[2]How we have "missed an opportunity to clarify an area of the law whose uncertainty could have tragic consequences" (conc. opn., *post,* at p. 298) is beyond us. We approve the direct seizure of this shotgun without any need to engage in the convoluted logic our profession is often reviled for, and deservedly so. The officers acted in a perfectly reasonable manner here. But our concurring colleague wants more. Assuming they had not found the shotgun when they did, his reasoning would allow them to return to the trailer after defendant was transported to the police station and tear his bed apart—without warrant, without reason, and in utter disregard for the Constitution of the United States.

Translated into law talk, the "tragic consequences" phrase impliedly pinned on our opinion by our colleague means that by not giving police a license to search when *Chimel* and the Fourth Amendment simply do not permit it, we "force" them to expose *themselves* to unnecessary danger by retaining the suspect in a particular location in order to use him as a pretext to search. In other words, the suggestion is by approving the search in this case we are encouraging the police to violate the law. Go figure.

(1995) 11 Cal.4th 354 [45 Cal.Rptr.2d 425, 902 P.2d 729] [detention of bystander during service of search warrant]; *People* v. *Frye* (1998) 18 Cal.4th 894, 989-990 [77 Cal.Rptr.2d 25, 959 P.2d 183] [warrantless entry on domestic violence call].) This is one such occasion, and choosing the route of least resistance to avoid recognizing that protection does a disservice to both them and the Constitution.

My colleagues describe this as "a simple *Chimel . . .* case," explaining that the gun was "within the immediate area of the still-being-removed arrestee . . . ." (Maj. opn., *ante*, at p. 290.) While I am pleased by a holding that the "grabbing area" of Chimel extends as far as 10 feet from a handcuffed arrestee, I am concerned that this holding does not provide the guidance for future cases which the federal courts have provided. I would therefore go further than the majority opinion.

I believe this case squarely presents an issue which has occupied the federal district and appellate courts at some length, but seems, through the flukish vicissitudes of appellate chance, to have escaped California's official reports: Does the removal of an arrestee from an area vitiate the right of law enforcement officers to search that area incident to his arrest? By not facing this issue today, we leave California police uncertain about the scope of their authority to search incident to arrest. That will force some officers to forego such searches and cause more reckless ones to contest their arrestees in a deadly jump ball for evidence and weapons, instead of removing them and returning for a safe search.

Appellant Richard Arnold Summers contends "that the area of his home searched was not within his immediate control such that he could destroy evidence or obtain a weapon at the time of the search and consequently that the search of his home was invalid under *Chimel* v. *California* (1969) 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685]." *Chimel*, of course, circumscribed searches incident to arrest by providing that they must be limited to "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." (*Chimel* v. *California* (1969) 395 U.S. 752, 763 [89 S.Ct. 2034, 2040, 23 L.Ed.2d 685].) This has come to be known in California as the "arm's-length rule," although it has never been so strictly construed.

Nonetheless, Summers argues that since he was "as much as 10 feet" from the shotgun, handcuffed, and under the watchful gaze of a police officer when the shotgun was found, it cannot be said that the weapon was within his "grabbing area." While I am somewhat distressed by the inelegance of the term "grabbing area," the good news seems to be that the courts interpreting this term have developed a reasonable and workable application of the phrase.

My search has disclosed no California cases directly on point, but search and seizure is an area in which federal law is dispositive (*In re Lance W.* (1985) 37 Cal.3d 873, 885-887 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Stoffle* (1991) 1 Cal.App.4th 1671, 1677 [3 Cal.Rptr.2d 257]), and there is an abundance of recent federal decisions to guide us. The rule arrived at by the federal circuits is well described in *U.S.* v. *Nohara* (9th Cir. 1993) 3 F.3d 1239, which upheld a search much like ours under a two-tine analysis: ". . . 1) the area searched must be that area under the arrestee's immediate control *when he was arrested*, and 2) events between the time of the arrest and search must not render the search unreasonable." (*Id.* at p. 1243, italics added.)

Key to the application of this standard in our case is the phrase, "when he was arrested" in the first prong of the test. Clearly the question is not, as Summers and my colleagues would have it, whether the area was under his immediate control *at the time of the search*, but rather whether the area was one into which he could have "grabbed" *at the time of his arrest.*

This distinction appears to be based upon a desire to ensure the existence of a body of search and seizure law which is both workable and safe for law enforcement officers properly carrying out their duties. Our courts have always striven for such a standard. The Supreme Court's opinion applying *Chimel* to automobile cases was directed toward this goal. As the court there recognized, "Although the principle that limits a search incident to a lawful custodial arrest may be stated clearly enough, courts have discovered the principle difficult to apply in specific cases. Yet . . . the protection of the Fourth and Fourteenth Amendments 'can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.' LaFave, 'Case-By-Case Adjudication' versus 'Standardized Procedures': The Robinson Dilemma, 1974 S. Ct. Rev. 127, 142. This is because 'Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be "literally impossible of application by the officer in the field." ' [Citation.] In short, '[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interest involved in the

specific circumstances they confront.' *Dunaway* v. *New York,* [(1979)] 442 U.S 200, 213-214 [99 S.Ct. 2248, 2257-2258, 60 L.Ed.2d 824]." (*New York* v. *Belton* (1981) 453 U. S. 454, 458 [101 S.Ct. 2860, 2863, 69 L.Ed.2d 768].)[1]

In *Belton,* the court recognized that articles inside the passenger compart-ment of a car were not "inevitably" within the area from which an arrestee might obtain a weapon, although they generally were. But it did not aspire to airtight logical rectitude so much as reasonableness. Its holding reflects that value judgment: It explicitly recognized that it was adopting a generalization that a driver's "arm's reach" *usually* would include the entire passenger compartment of the car, and then said, "In order to establish the workable rule this category of cases requires, we read *Chimel's* definition of the limits of the area that may be searched in light of that generalization. Accordingly, we hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (*New York* v. *Belton, supra,* 453 U.S. at p. 460 [101 S.Ct. at p. 2864], fn. omitted.)

The same commonsense considerations have informed the definition of *Chimel's* "grabbing area" in nonautomobile search incident to arrest cases. An effort has been made to balance the rights of the citizenry against the need for safe, workable, and intelligible directions to police. As the Supreme Court recognized in *United States* v. *Robinson* (1973) 414 U.S. 218, 235 [94 S.Ct. 467, 477, 38 L.Ed.2d 427], "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a

---

[1]Our courts have consistently recognized the need to interpret Fourth Amendment strictures so as to recognize the exigencies of effective and safe law enforcement without eviscerating the protection of the citizenry. Thus, in analogous circumstances in *People* v. *McDowell* (1988) 46 Cal.3d 551 [250 Cal.Rptr. 530, 763 P.2d 1269], the plain sight rule was applied to allow a police officer searching for a murder suspect to gather up evidence he had seen inside the suspect's house even when that necessitated reentering the house without a warrant or applicable exception to the warrant rule. The California Supreme Court's words in *McDowell* could be applied with equal force to this case: "We do not believe [the officer] relinquished his right to seize this evidence by giving more immediate priority to defendant's arrest." (*Id.* at p. 564.)

particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect."[2]

Following the lead of the Supreme Court, the federal circuits have recognized the folly of promulgating a rule designed to enable the police to protect themselves and then interpreting it to require them to put themselves at risk in order to take advantage of it. Phrased less circuitously, it makes no sense to condition a search incident to arrest upon the willingness of police to remain in harm's way while conducting it.

Therefore the courts have refined a rule which protects the individual from unreasonable search and the officer from unreasonable danger. They have provided that the "grabbing area" described by *Chimel* applies to the area immediately accessible to the suspect *at the time of his arrest*, and that a search of that area may be made subsequent to the arrest, so long as it is reasonably contemporaneous and nothing has occurred in the meantime to render it unreasonable. This removes police from the horns of a dilemma which would require them either to forego search incident to arrest, or to keep the suspect at least figuratively within arm's reach while conducting such a search, thereby assuring the very danger it was meant to prevent.

While the majority derides this as "officer opportunism"(maj. opn., *ante*, at p. 290), I do not see it that way. The right to search attaches at the moment of arrest. I am not offended, the federal courts are not offended, and most importantly the Constitution is not offended by allowing police to delay exercise of that right until they can do so safely.

This approach was employed in *Davis* v. *Robbs* (6th Cir. 1986) 794 F.2d 1129, a civil rights action against police officers. In *Davis*, police surrounded the home of a suspect who had threatened to kill anyone who tried to arrest him. Through a window, they watched him talking on the phone, after which he announced his intention to surrender and left his rifle at the phone table. He was taken into custody at the front door, handcuffed, and placed in a squad car, after which the officer who became the named defendant entered the house and seized the rifle.

Recognizing the obvious counterproductivity of a rule that would require police to keep the suspect near the gun if they wished to seize it incident to

---

[2]Justice Powell, concurring, went even further: "I believe that an individual lawfully subjected to a custodial arrest retains no significant Fourth Amendment interest in the privacy of his person. . . . This seems to me the reason that a valid arrest justifies a full search of the person, even if that search is not narrowly limited by the twin rationales of seizing evidence and disarming the arrestee." (*United States* v. *Robinson, supra,* 414 U.S. at p. 237 [94 S.Ct. at p. 494] (conc. opn. of Powell, J.).)

arrest, the circuit court held, "Under the circumstances prevailing at the time of the plaintiff's arrest, including Davis' immediate proximity to the loaded rifle which was in clear view and easily accessible to him, the police were lawfully entitled to seize the rifle after having placed the plaintiff into the squad car." (*Davis* v. *Robbs, supra,* 794 F.2d at p. 1131.)

While not explicitly adopting *Davis*, the Seventh Circuit upheld a search of the luggage of suspected bank robbers, even though they had been handcuffed and moved away from the luggage at the time of the search. (*U. S.* v. *Bennett* (7th Cir. 1990) 908 F.2d 189.) And a year later, the Ninth Circuit made its first foray into this area in *U.S.* v. *Turner* (9th Cir. 1991) 926 F.2d 883, whose similarities to our case are remarkable.

In *Turner*, police entered an apartment with an arrest warrant for Turner and found him in bed with a woman and a .45-caliber revolver. They handcuffed him, took him into another room, and then returned and searched the bedroom, finding, inter alia, cocaine base under his pillow. In ruling on the admissibility of the cocaine, the Ninth Circuit noted it had never before had to determine "whether searches incident to arrest may ever encompass a room from which the arrestee has been removed" (*U.S.* v. *Turner, supra,* 926 F.2d at p. 887), so it looked to other circuits for precedent: "The reasoning of the Seventh Circuit is helpful. In *United States v. Fleming,* 677 F.2d 602, 607 (7th Cir. 1982), that court held that a search incident to arrest was valid even though it was conducted five minutes after the arrest, while the arrestee was handcuffed. [¶] To reach this result, the court used a two-level inquiry. First, it put itself in the officers' position and determined whether the searched bag was within the arrestee's immediate control *when he was arrested.* The answer was yes. Next, it considered whether events occurring after the arrest but before the search made the search unreasonable. It determined that the officers acted reasonably and out of a concern for their safety when they delayed the search five minutes and first handcuffed the arrestee. The court reasoned that 'it does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures.' [Citation.] [¶] We adopt the Seventh Circuit's approach. First, we consider whether the baggies of cocaine base were within Turner's immediate control when he was arrested. They were. He was on the bed with the baggies when he was arrested. [¶] Next we consider whether subsequent events made the search unreasonable. The officers handcuffed Turner and took him into the next room out of a concern for safety. We cannot say that these concerns were unfounded, for they had already discovered a concealed weapon beneath the bedding. They did not take him far away or delay for long before conducting the search. Under the circumstances, we cannot find the search that revealed

the baggies of cocaine inconsistent with *Chimel* or *Andersson*. The baggies were validly seized during a search incident to arrest." (*U.S.* v. *Turner,* *supra,* 926 F.2d at pp. 887-888, fn. omitted.)

The most recent paradigm appears to be *U.S.* v. *Hudson* (9th Cir. 1996) 100 F.3d 1409. There, federal agents investigating suspected methamphetamine trafficking by the Hessians Outlaw[3] Motorcycle Gang, executed an arrest warrant at the home of Hudson's parents. They located Hudson in a bedroom, standing over a rifle case, arrested him, and removed him from the house. Then, after completing a protective sweep of the house in which they looked for other suspects, they returned to the bedroom and searched the rifle case, finding, *mirabile dictu,* a rifle.

The Ninth Circuit upheld the search of the rifle case as incident to Hudson's arrest. Applying the standard enunciated in *U.S.* v. *Nohara, supra,* 3 F.3d 1239, they found that the three minutes necessary to assure the officers' safety by sweeping the house did not render the search unreasonable or untimely. Then, addressing Hudson's removal from the room where the rifle was found, they held, "When Hudson was called out of his bedroom and arrested, one of the arresting officers noticed a rifle case near his feet. Although the rifle was contained in a case, it was nevertheless well within Hudson's reach, and thus constituted a potential danger to the arresting officers. The physical proximity of the rifle thus supports a conclusion that the search fell squarely within the spatial limitations of a search incident to arrest." (*U.S.* v. *Hudson, supra,* 100 F.3d at p. 1420.)

*Turner* and *Hudson* represent the proper application of *Chimel* to our facts. It is not a complex exercise. Summers was being convoyed from the trailer in handcuffs when the shotgun was found. While it cannot be said with assurance whether he was just inside or just outside the door at the moment of discovery, it can be said with absolute certainty that the shotgun was in an area to which he had immediate access *at the time he was arrested.* At that time he was standing next to the bed, and the shotgun was under the pillow. So at the time of arrest, the shotgun was unquestionably within the area into which he could have reached to gain access to a weapon.

And there is nothing unreasonable about the 10 minutes it took to round up the third occupant of the trailer so as to guarantee the safety of the officers. A common thread running through all the opinions in this area is

---

[3]This is not a value judgment; apparently the term "Outlaw" is part of the Hessians' full chosen name.

recognition that brief efforts to secure the arrestee or the area do not vitiate a search incident to arrest.

Under this analysis, as under my colleagues', the seizure of Summers's shotgun was incident to his arrest. I therefore agree that the judgment should be affirmed, but lament the fact that we've missed an opportunity to clarify an area of the law whose uncertainty could have tragic consequences.

A petition for a rehearing was denied July 30, 1999.