Filed 11/13/15  P. v. McNeill CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>JOSHUA JAMES McNEILL,<br><br>      Defendant and Appellant. | F068889<br><br>(Super. Ct. No. BF150052A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Joshua McNeill guilty of unlawful possession of a firearm by a felon. The conviction resulted in a two-year prison sentence.  On appeal, McNeill raises a number of constitutional search and seizure issues, and contends that law enforcement

officers elicited incriminating statements from him in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He also alleges error in relation to the evidentiary rules articulated in *People v. Harvey* (1958) 156 Cal.App.2d 516 (*Harvey*) and *People v. Madden* (1970) 2 Cal.3d 1017 (*Madden*).  Finally, McNeill seeks review of the denial of a motion made pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).  Finding no grounds for reversal, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2013, Deputies Daniel Barron and Jesse Quiapo of the Kern County Sheriff's Office were dispatched to a residential address.  According to Deputy Quiapo, the dispatcher had relayed to them a report of "an explosion or a noise similar to an explosion coming from the garage of the residence."  Upon arriving at the home, the deputies observed Joshua McNeill standing in the driveway, in front of an open detached garage, talking on a cellphone.

Deputy Barron exited his patrol car and walked towards McNeill, greeting him as he approached.  As he proceeded up the driveway, the deputy saw a shotgun lying on top of a chest freezer in the front interior portion of the garage.  The weapon was located approximately 10 feet away from where McNeill was standing.  Deputy Barron told McNeill not to move, and then asked him to walk away from the firearm.  McNeill complied with these instructions and walked over to the front lawn to speak with Deputy Barron.

McNeill confirmed that he lived at the residence and denied being on probation or parole.  He also consented to a pat-down search, which revealed no weapons.  After frisking McNeill, Deputy Barron left him under Deputy Quiapo's supervision and stepped into the garage to secure the firearm ("I picked up the shotgun, ran the action to see if it was loaded, determined it was unloaded, [and] placed it back down on the freezer with an open chamber and on safe.").  After clearing the shotgun, Deputy Barron discovered that McNeill's girlfriend was inside of the garage.  He asked the woman to

2.

exit the structure and move to the front of the house, which she did. Deputy Barron then walked back over to McNeill and engaged him in further conversation.

Deputy Barron asked McNeill for an explanation regarding the report of a "loud noise" at his address. McNeill replied that his boss, Ron Rogers, was paying him to perform gunsmithing work on the shotgun, and that he had accidentally discharged the weapon while working on it inside of the garage. McNeill provided a detailed account of how the gun had gone off, where he was standing when it happened, and the direction in which the shot had been fired. As this conversation was taking place, the owner of the gun, Mr. Rogers, pulled up to the house in a truck.

At some point prior to the arrival of Mr. Rogers, one of the deputies radioed for a records check on McNeill. The results indicated a prior felony conviction. When confronted with this information, McNeill admitted that he was a convicted felon. Deputy Barron subsequently arrested McNeill, placed him in the back of his patrol car, and advised him of his *Miranda* rights. McNeill waived his right to remain silent and repeated the information he had provided earlier, adding that he held three certifications in gunsmithing, which was apparently why Mr. Rogers had hired him to fix a problem with the gun's ejector. McNeill again admitted his status as a convicted felon, and said that he knew it was unlawful for him to possess a firearm. Deputy Barron seized the shotgun before taking McNeill to jail.

McNeill was charged by information with being a felon in possession of a firearm in violation of Penal Code section 29800, subdivision (a)(1) (all statutory references will be to the Penal Code unless otherwise specified). It was further alleged that he had served a prior prison term within the meaning of section 667.5. The charging document contained a second count, which was later dismissed, for unlawful possession of ammunition (§ 30305, subd. (a)). The case went to trial in December 2013.

McNeill filed a discovery motion pursuant to *Pitchess, supra*, seeking the disclosure of Deputy Barron's personnel records. He also moved to suppress evidence

3.

allegedly obtained in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution. Additional information concerning the denial of these motions is provided in the Discussion, *infra*.

At trial, Deputies Barron and Quiapo testified to the facts summarized above. They also attested to seeing damage to McNeill's home which had been caused by his accidental discharge of the shotgun. The deputies observed and photographed a four-inch hole in the siding of a patio connected to McNeill's house, and what appeared to be birdshot holes in a plastic trash can. Deputy Quiapo also took pictures of the shotgun. These photographs were admitted into evidence during the prosecution's case-in-chief. The defense rested without presenting any evidence. Both parties stipulated to the fact that McNeill was convicted of a felony in February 2011.

The jury found McNeill guilty as charged under section 29800, subdivision (a)(1). A bifurcated bench trial was held on the prior prison term allegation, which was found to be true. The offense underlying the prior prison term was possession of a firearm by a felon in violation of former section 12021, subdivision (a)(1). At sentencing, the trial court imposed the middle term of two years for the section 29800 conviction and exercised its discretion to strike the punishment for the prior prison term enhancement.

## DISCUSSION

### *Pitchess* **Motion**

In *Pitchess*, *supra*, the California Supreme Court held that criminal defendants have a limited right to discovery of peace officer personnel records in order to ensure "a fair trial and an intelligent defense in light of all relevant and reasonably accessible information." (*Pitchess*, *supra,* 11 Cal.3d at p. 535.) The process for obtaining such discovery is set forth in sections 832.7 and 832.8, and Evidence Code sections 1043 through 1045. (*Chambers v. Superior Court* (2007) 42 Cal.4th 673, 679.) "The procedure requires a showing of good cause for the discovery, an in camera review of the records if good cause is shown, and disclosure of information 'relevant to the subject

4.

matter involved in the pending litigation.'" (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316, quoting Evid. Code, § 1045, subd. (a).) We review the denial of a *Pitchess* motion for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

McNeill sought discovery of Deputy Barron's personnel records to find evidence of false statements in reports, false testimony, and/or complaints of dishonesty. He now asks that we scrutinize the trial court's denial of his request. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232 [outlining the steps for evaluating a *Pitchess* motion at the trial court level and on appeal].) After reviewing a transcript of the in camera hearing on McNeill's *Pitchess* motion, as well as the confidential materials produced at that proceeding, we conclude the motion was properly denied and find no abuse of discretion by the trial court.

### *Harvey/Madden* **Objection**

<u>Background</u>

McNeill filed a motion to suppress evidence pursuant to section 1538.5 which sought to exclude "all observations, physical evidence, and statements" obtained as a result of unlawful searches or seizures. Included within his moving papers was a demand for "the source of probable cause in this case," followed by citations to *Harvey*, *supra*, 156 Cal.App.3d at p. 522 and *Remers v. Superior Court* (1970) 2 Cal.3d 659, 667 (*Remers*). The prosecution interpreted this as a "*Harvey/Madden* objection," referring to the line of cases which hold that when a police officer makes an arrest based on information received through "official channels," the government must show the officer who originally furnished the information had probable cause to believe the suspect had committed a felony (*Madden*, *supra*, 2 Cal.3d at p. 1021). In its written opposition, the prosecution argued that the *Harvey/Madden* rule did not apply because the underlying arrest was based on personal observations of the investigating deputies, and not upon probable cause supplied by a third party source.

The motion to suppress was heard approximately three weeks prior to the start of trial. Deputy Barron testified at the hearing, but the prosecution's questioning produced only an abbreviated summary of the facts. His testimony established that he was dispatched to McNeill's residence at around 11:35 a.m., and indicated there had been some type of report about a "loud noise." He further testified to his discovery of the shotgun and his conversations with the defendant, including McNeill's admission that he had accidentally discharged the firearm. The *Harvey/Madden* issue was never addressed, and the matter was taken under submission at the conclusion of the hearing. Four days later, the trial court issued a minute order denying the motion.

McNeill renews his *Harvey*/*Madden* objection on appeal. The crux of his argument is that the prosecution failed to show Deputies Barron and Quiapo were in fact dispatched to McNeill's home to investigate a report of a loud noise or explosion. He claims the absence of a proper evidentiary foundation in this regard should have resulted in the granting of his motion to suppress. The Attorney General fails to address these arguments in her briefing. Despite her silence on the issue, we reject McNeill's claim on the merits.

Analysis

In reviewing the denial of a section 1538.5 motion to suppress, we "defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.) The legal question of whether, "on the facts so found, the search or seizure was reasonable under the Fourth Amendment," is reviewed de novo. (*Ibid*.) "There is, of course, no requirement that a trial court's ruling on a suppression motion be accompanied by 'findings' or even a statement of the court's inference from the evidence, views as to the applicable law, or reasons for its ruling." (*People v. Manning* (1973) 33 Cal.App.3d 586, 599-600 (*Manning*).) "Generally, the ruling of a trial court upon a motion implies a finding of fact favorable to the prevailing party on each ground or theory underlying the motion.

6.

[Citation.] The implication applies specifically to rulings admitting or excluding evidence." (*Id*. at pp. 601-602). Therefore, although McNeill's *Harvey*/*Madden* objection was not addressed at the suppression hearing, it was impliedly overruled by the trial court and we must defer to all implied findings in support of that ruling to the extent they are supported by the record. (Evid. Code, § 402, subd. (c); *Manning*, *supra*, 33 Cal.App.3d at pp. 601-602.)

The so-called *Harvey*/*Madden* rule is derived from its namesake cases. In *Harvey*, police officers put a man under surveillance after receiving information from a superior officer that he was involved in narcotics trafficking. (*Harvey*, *supra*, 156 Cal.App.2d at p. 519, 521.) Although the surveillance revealed nothing but "'innocent actions that any law-abiding citizen should be able to engage in without fear of search or arrest,'" the officers took the man into custody and searched his person, which yielded a package of marijuana. (*Id*. at p. 520.) At trial, the prosecution attempted to establish probable cause for the arrest by pointing to the tip from the arresting officers' colleague. On appeal, the officers' exclusive reliance upon the unsworn and unverified statements of their superior officer, who had himself received the tip from an unidentified informant, was deemed insufficient to establish probable cause for the arrest. (*Id*. at p. 521.) To hold otherwise "would permit the manufacture of reasonable grounds for arrest within a police department by [such means] without establishing under oath that the information had in fact been given to any officer by the informer, or indeed that there was an informer at all." (*Id*. at p. 523, conc. opn. of Dooling, J. and Draper, J.)

The *Madden* case involved facts similar to those in *Harvey*. The arresting officer had attempted to follow up on reports from two colleagues that the defendant was dealing drugs out of his home. The officer went to the defendant's residence, established contact with him at his front door, then entered the house without a warrant and searched the premises until he found narcotics. When defendant challenged the legality of the search, the trial court ruled that the officer's warrantless entry to the home was justified because

he had probable cause to believe a felony was being committed inside. (*Madden*, *supra*, 2 Cal.3d at pp. 1019-1020.) In overturning this ruling, our Supreme Court reiterated that "'while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, "when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness."'" (*Id.* at p. 1021, quoting *Remers*, *supra*, 2 Cal.3d at p. 666, additional citations omitted.)

The *Harvey/Madden* rule applies to detentions as well as arrests. (*People v. Brown* (2015) 61 Cal.4th 968, 983 (*Brown*).) When a detention is made pursuant to information received by police through a dispatch, the prosecution can satisfy its evidentiary burden with direct evidence in the form of testimony from the dispatcher or the person who supplied the information upon which the dispatch was based. (*Ibid.*) Alternatively, the prosecution may produce circumstantial evidence which shows the police did not fabricate the information contained in the dispatch, or the occurrence of the dispatch itself. (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1258-1260 (*Richard G.*); *People v. Johnson* (1987) 189 Cal.App.3d 1315, 1320 (*Johnson*) ["the information transmitted by the police dispatcher was corroborated by what the officers observed at the scene, making it virtually impossible for the information to have been made up in the police department"]; *People v. Orozco* (1981) 114 Cal.App.3d 435, 444-445 [presence of cartridges outside the subject vehicle supported "a very strong inference that the police did not make up" a dispatcher's report of information that shots were being fired from a vehicle].)

In *Richard G.*, *supra*, police officers responded to a radio dispatch concerning two males who were causing a disturbance outside of a residence, one of whom was possibly armed with a handgun. The dispatch, which was received at approximately midnight, provided a description of the suspects' clothing and advised that they were last seen heading in the direction of a nearby park. The officers drove around the park and soon

observed two males and two females walking through the area. The males were wearing clothing that matched the description provided by the dispatcher. After exiting their patrol car, the officers approached the group and attempted to make an investigatory stop. One of the males refused to comply with their commands and physically assaulted one of the officers. (*Richard G.*, *supra*, 173 Cal.App.4th at p. 1256.)

The accused in *Richard G.* filed a motion to suppress on grounds that police lacked reasonable suspicion to detain him. A *Harvey/Madden* objection was lodged in conjunction with the motion and pursuant to the argument that the detention could not be proven lawful unless the prosecution identified the source of the report that prompted the dispatch or called the police dispatcher to testify that it had been received. (*Richard G.*, *supra*, 173 Cal.App.4th at p. 1256.) The prosecution failed to proffer such evidence, but the trial court nevertheless allowed the arresting officers to testify about the dispatch and ultimately denied the motion to suppress. (*Ibid.*) The Second District upheld the ruling despite acknowledging that the prosecutor may have "blundered by not producing in court the recipient of the original telephone report." (*Id.* at p. 1260.) The affirmance was based on circumstantial evidence in the record and "the reasonable inferences flowing from it," which showed the officers did not fabricate any information related to the dispatch. (*Id.* at p. 1259.) "When the judiciary can reasonably determine that no evidence has been manufactured, there is no reason for strict compliance with the letter of the '*Harvey-Madden*' rule." (*Id.* at p. 1260.)

The holding of *Richard G.* is applicable to this case. Respondent was represented at the suppression hearing by a certified law clerk who could have done a better job of laying an evidentiary foundation as to the reason for Deputy Barron's presence at McNeill's home. Even so, the deputy's testimony provided substantial evidence to support the implied finding that neither the occurrence of the dispatch nor the information contained therein had been fabricated. As in *Richard G.*, absent "clairvoyance on the part of the dispatcher," there is no way the dispatcher could have made up that a loud noise

had emanated from McNeill's property during the relevant time period. (*Richard G.*, *supra*, 173 Cal.App.4th at p. 1259.) The information was confirmed by McNeill's admission that he accidentally discharged a shotgun inside of his garage shortly before Deputy Barron's arrival, and was independently corroborated by circumstantial evidence. We are also persuaded by the prosecution's original argument that the arrest (and any detention that may have preceded it) was primarily based on what the deputies observed and discovered at the scene. (See *Johnson*, *supra*, 189 Cal.App.3d at p. 1319 [the *Harvey/Madden* rule applies to situations where "'"the detaining officer himself does not have personal knowledge of facts justifying the detention, but acts *solely* on the basis of information or direction given him through police channels ...."'" (italics added)].)

**Fourth Amendment Issues**

McNeill's motion to suppress was based on the argument that he was illegally detained at the outset of his encounter with Deputy Barron. He maintains this position on appeal, and also reasserts the contention that Deputy Barron's warrantless entry into his garage was unlawful. We review the trial court's rejection of these claims under the standard described in our discussion of the *Harvey/Madden* issue.

Reasonable Suspicion to Detain

Citizens have a constitutional right to be free from unreasonable searches and seizures. (U.S. Const., 4th & 14th Amends.; Cal. Const., art. I, § 13.) Deputy Barron's entry onto McNeill's property via his driveway did not fall within either category. A law enforcement officer may enter a driveway for purposes of attempting to initiate a consensual encounter with the occupants of the home, which is what occurred here. (*People v. Lujano* (2014) 229 Cal.App.4th 175, 184; accord, *People v. Edelbacher* (1989) 47 Cal.3d 983, 1015 [police observations from "front porch, driveway, and front yard portion" of defendant's residence did not violate the Fourth Amendment].)

The next issue is whether McNeill was detained when Deputy Barron instructed him to stop and move away from the shotgun. A detention is a seizure within the

10.

meaning of the Fourth Amendment; it occurs when a police officer restrains a person's liberty by force or show of authority. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1081.) The trial court did not make an express finding on this point, but advised the parties that it had "no issue with an officer telling someone not to move when there is a gun in the area." We will assume for purposes of this discussion that McNeill was detained when Deputy Barron attempted to exercise control over his movements.

In *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court established a framework for determining the legality of a detention that is based on something less than probable cause. The touchstone of the analysis is the objective reasonableness of an officer's actions. (*Michigan v. Long* (1983) 463 U.S. 1032, 1051; *Terry*, *supra*, 392 U.S. at p. 19.) A detention is reasonable under the Fourth Amendment, and therefore legal, "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.)

McNeill claims "the mere presence of a shotgun in [his] private garage could not possibly provide [Deputy] Barron with reasonable suspicion" that he was engaged in criminal activity. He further contends that if the deputies were initially justified in making an investigatory stop, the detention became unduly prolonged after he advised Deputy Barron that he was a resident of the home (and thus had a right to be on the property). However, these arguments incorrectly assume all evidence of the dispatch which prompted the investigation should have been excluded under the *Harvey*/*Madden* rule and should be ignored for purposes of our Fourth Amendment analysis.

Under *Terry*, the legality of the detention ultimately comes down to "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry*, *supra*, 392 U.S. at p. 27.) "Moreover, a perfectly reasonable apprehension of danger may arise long before the officer is

11.

possessed of adequate information to justify taking a person into custody for the purpose of prosecuting him for a crime." (*Id*. at pp. 26-27.)  Given the presence of a firearm in close proximity to McNeill, it was reasonable for Deputy Barron to effectuate a brief detention to ensure his own safety and the safety of others at the scene.

McNeill's argument that the detention was too prolonged is unconvincing.  "[T]he possibility of innocent explanations for the factors relied upon by a police officer does not necessarily preclude the possibility of a reasonable suspicion of criminal activity." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 146.)  A police officer investigating a report of a loud noise at a residence could form a reasonable suspicion of criminal activity after seeing a shotgun lying out in plain view upon his or her arrival to the specified address.  Although McNeill provided an innocent explanation for what had happened, the deputies had a right to investigate the matter further by initiating a records check.

"An officer 'who lacks the precise level of information necessary for probable cause to arrest' is not constitutionally required to 'simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. [Citation.]  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.'" (*Brown*, *supra*, 61 Cal.4th at p. 986, quoting *Adams v. Williams* (1972) 407 U.S. 143, 145-146.)  In consideration of these principles, and under the totality of the circumstances in this case, we conclude appellant was not unlawfully detained prior to his arrest.

<u>Warrantless Entry</u>

Deputy Barron's entry into McNeill's garage was the main point of contention at the suppression hearing.  The prosecution characterized the incident as a "plain view search," and also claimed the entry was justified in the interest of officer safety.  The trial

court was persuaded by the latter argument. Respondent expands upon the officer safety concept in its briefing, arguing the deputy's actions were justified by "exigent circumstances." McNeill submits that the evidence does not support a finding of exigency because he was already safely detained when Deputy Barron entered his garage.

Our analysis begins with the rule that evidence obtained in violation of the Fourth Amendment is inadmissible at trial. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655.) "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." (*Payton v. New York* (1980) 445 U.S. 573, 586.) A detached garage is generally considered part of the home for purposes of the Fourth Amendment. (*People v. Hobbs* (1969) 274 Cal.App.2d 402, 406; see *People v. Robles* (2000) 23 Cal.4th 789, 795 (*Robles*) ["a garage that is attached or adjacent to a home may give rise to a legitimate expectation of privacy therein."].) Therefore, the warrantless entry into McNeill's garage should have triggered the exclusionary rule unless Deputy Barron's actions were justified under an exception to the presumptive warrant requirement.

McNeill correctly notes that the prosecution's "plain view" argument was flawed. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 375.) In this instance, the incriminating character of the shotgun was not necessarily apparent when Deputy Barron first entered the garage to examine it. More importantly, McNeill had a reasonable expectation of privacy in the structure where the firearm was located. The prosecution was thus obligated to establish the government's lawful right of access to the garage. (*Texas v. Brown* (1983) 460 U.S. 730, 738-739 ["'Plain view' is perhaps better understood… not as an independent 'exception' to the warrant clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be."]; *Robles*, *supra*, 23 Cal.4th at

pp. 793, 801 [plain view doctrine not applicable to officer's warrantless entry into a private garage even though he could see that a stolen vehicle was parked inside].)

Turning to respondent's contention on appeal, "the exigent circumstances doctrine constitutes an exception to the warrant requirement when an emergency situation requires swift action to prevent imminent danger to life." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156.) "'''The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." [Citation.] And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.'" (*Id.* at p. 1156, quoting *Mincey v. Arizona* (1978) 437 U.S. 385, 392-393.) "There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276.)

"The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified…." (*People v. Celis* (2004) 33 Cal.4th 667, 676 (*Celis*), citing *Minnesota v. Olson* (1990) 495 U.S. 91, 100.) We do not doubt that Deputy Barron acted in the interest of officer safety, but, as McNeill stresses in his briefs, the deputy's testimony at the suppression hearing did not suggest that he perceived an emergency situation when he entered the garage. A more persuasive argument would be that he entered the garage to conduct a "protective sweep" in accordance with the holding of *Maryland v. Buie* (1990) 494 U.S. 325. "A protective sweep can be justified merely by a *reasonable suspicion* that the area to be swept harbors a dangerous person." (*Celis*, *supra*, 33 Cal.4th at p. 678.) However, McNeill raises a valid point in arguing that Deputy Barron never testified to entering the garage because he suspected a dangerous person might be hiding inside.

If the warrantless entry did not occur pursuant to exigent circumstances or as part of a protective sweep, confiscation of the shotgun would have likely been justified as a

14.

seizure incident to arrest, at which point the deputies could have lawfully taken the photographs that were shown to the jury.[1]  The facts can be analogized to those in *People v. Summers* (1999) 73 Cal.App.4th 288 (*Summers*), where the search and seizure of a shotgun which occurred "roughly 10 feet away" from where the defendant was located was found to be incident to his arrest, even though he was handcuffed and was being escorted away by other officers.  (*Id*. at pp. 290-291.)  The police in *Summers* were reacting to a "fluid situation" and had to account for the presence of third parties; "one roommate was present and free of police control, and another was unaccounted for when the weapon was chanced upon."  (*Id*. at p. 291.)

In light of the presence of both McNeill's girlfriend and the owner of the firearm, it is understandable that Deputies Barron and Quiapo wanted to secure the shotgun for purposes of officer safety and to prevent the loss or destruction of material evidence.  The *Summers* case is not dispositive of the issue, however, because we cannot tell from the record when and under what circumstances the photographs of the shotgun were taken.  Our knowledge of the relevant facts is limited to the deputies' trial testimony, which we have summarized, but the trial court had been presented with far less evidence on this issue when it denied the motion to suppress.  There is also the question of whether an unjustified entry by Deputy Barron to secure a weapon discovered in plain view would have invalidated a subsequent and otherwise legal seizure incident to arrest.

Were we to conclude the physical evidence used at trial should have been suppressed because of a Fourth Amendment violation, we would find the error to be harmless beyond a reasonable doubt.  (See *Chapman v. California* (1967) 386 U.S. 18,

---

[1] At our request, the photographic exhibits in this case were transmitted by the trial court so that we could review them prior to oral argument.  (See Cal. Rules of Court, rule 8.224(d) and rule 8.320(e) [exhibits admitted at trial are deemed part of the record in a criminal appeal].)  It appears all photographs of the shotgun were taken from inside of the garage.

15.

24.) As the trial court aptly noted, exclusion of the shotgun would not have prevented Deputy Barron from testifying in regards to its presence at the scene. The same is true vis-à-vis any exclusion of the photographs taken inside of the garage. Since the gun was lawfully discovered in plain view, the deputy's personal observations were admissible. McNeill's admissions with respect to handling and firing the weapon were also admissible. (See further discussion, *infra*.) Therefore, the element of firearm possession was independently established by compelling and uncontroverted evidence. Because the strength of the prosecution's case was overwhelming without pictures of the shotgun, there are no grounds for reversal under the Fourth Amendment.

**Fifth Amendment Issues**

Background

McNeill filed a motion in limine to exclude all pre-arrest and post-arrest statements allegedly obtained in violation of his Fifth Amendment rights. His motion was addressed at a hearing conducted pursuant to Evidence Code section 402. Deputy Barron testified at the hearing, and his testimony served as the basis for the trial court's findings. The court found the pre-arrest questioning by Deputy Barron prior to his knowledge of McNeill's criminal history was not custodial interrogation. In other words, the inquiries were made in an investigatory context and were not designed to elicit incriminating statements. McNeill's responses to those questions were deemed voluntary and admissible.

In the trial court's view, the nature of Deputy's Barron's questioning changed after he learned McNeill had a prior felony conviction. He subsequently asked McNeill if he was, in fact, a convicted felon, and McNeill responded affirmatively. This particular question and answer was ruled inadmissible because Deputy Barron had at that point made an attempt to elicit an incriminating response without advising the suspect of his *Miranda* rights. However, the trial court found McNeill's post-arrest statements to be admissible pursuant to an informed waiver of his right to remain silent, and made a

16.

specific finding that the one improper pre-arrest question did not invalidate McNeill's post-*Miranda* confession.

Analysis

McNeill's arguments primarily concern the admissibility of his post-arrest, post-*Miranda* statements.  In reviewing his contentions, we must "'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement[s] [were] illegally obtained.'"  (*People v. Thomas* (2011) 51 Cal.4th 449, 476.)

If a defendant is subjected to custodial interrogation without being advised of his or her Fifth Amendment rights under *Miranda*, any statements made during the interrogation cannot be used in the prosecution's case-in-chief.  (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162; *People v. Thornton* (2007) 41 Cal.4th 391, 432.)  A custodial situation arises when a reasonable person in the suspect's position would believe their freedom of action has been "curtailed to a 'degree associated with formal arrest.'"  (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440.)  "Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.)

There is a difference between custodial interrogation and "'general on-the-scene investigatory questioning.'"  (*People v. Hill* (1974) 12 Cal.3d 731, 767, overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5.)  Custodial interrogation does not ordinarily occur during a field investigation "where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."  (*People v. Farnam* (2002) 28 Cal.4th 107, 180.)  Our previous discussions highlight the substantial evidence in support of the finding regarding Deputy Barron's investigatory questions.

17.

The inquiries and responses leading up to the excluded question about McNeill's felony conviction did not constitute interrogation for purposes of the Fifth Amendment. Therefore, McNeill's pre-arrest admission to possessing a firearm was not subject to exclusion at trial.

In challenging the admission of his post-arrest statements, McNeill relies upon *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), which condemned the use of a two-step technique employed by police departments to circumvent the requirements of *Miranda*. The *Seibert* case involved officers who had been trained to "question first, then give the warnings, and then repeat the question," in order to increase the likelihood that a suspect would not invoke his or her Fifth Amendment rights under interrogation. (*Seibert*, *supra*, 542 U.S. at pp. 605-606, 613.) The defendant in *Seibert* was arrested in the middle of the night, taken to a police station, and questioned for approximately 30 to 40 minutes without being advised of her *Miranda* rights. Once police had obtained incriminating statements from her, they gave her a 20-minute smoke break and then conducted a second, recorded interview which began with a *Miranda* warning. (*Id.* at pp. 605-606.) A plurality of the United States Supreme Court held that statements made by a suspect "after a warning *in such circumstances* is inadmissible." (*Id.* at p. 604, italics added.)

The *Seibert* opinion does not establish a bright-line test, but rather identifies "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Seibert*, *supra*, 542 U.S. at p. 615.) The facts in the present matter are not remotely similar to those in *Seibert*. Considering the totality of the circumstances, the record contains substantial evidence in support of the trial court's

18.

finding that a single improper question by Deputy Barron prior to making the arrest did not render McNeill's post-arrest confession involuntary or otherwise inadmissible.

Finally, we note that any error in allowing testimony concerning McNeill's post-arrest admission to being a convicted felon would have been harmless beyond a reasonable doubt. This is so because McNeill actually stipulated to that fact at trial. Thus, there are no possible grounds for reversal.

## DISPOSITION

The judgment is affirmed.


_____
GOMES, Acting P.J.

WE CONCUR:


_____
DETJEN, J.


_____
SMITH, J.